JAMES GULSETH, ESQ. (SBN 61369)
LILIA BULGUCHEVA, ESQ.  (SBN 291374)
JGPC LAW
5890 Stoneridge Drive, Suite 102
Pleasanton, CA 94588
Telephone: (925) 463-9600
Facsimile: (925) 463-9644
Email: jgulseth@jgpc.com
       lbulgucheva@jgpc.com

TALISMAN LAW, P.C.
DONALD E. CHOMIAK, ESQ. (SBN 225156)
don@talismanlaw.com
100 Wilshire Blvd., Suite 700
Santa Monica, CA 90401
Telephone:   (310) 917-1027
Facsimile:   (310) 494-0762

Attorneys for Defendants/Cross-Defendants MANDEEP DHOAT and SAFEAEON, INC., and Cross-Claimant MANDEEP DHOAT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAJESH KHANNA, an individual, and RNN, LLC, an Illinois limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> HARPREET WALIA, an individual, MANDEEP DHOAT, an individual, SAFEAEON INC., a Delaware corporation, SEVENSECUR INC., a Delaware corporation, WALIA ESTATES LLC, a California limited liability company, WAVESTRONG, INC., a California corporation, and DOES 1-10, <br><br> Defendants. <br><br> ——————————————— <br><br> AND RELATED CROSS-ACTIONS <br> ——————————————— | Case No. 3:24-cv-03716-JSC <br><br> **VERIFIED SECOND AMENDED CROSS-COMPLAINT FOR:** <br><br> 1. **RESCISSION (ON THE BASIS OF FRAUD IN THE INDUCEMENT);** <br> 2. **WIRE FRAUD (18 U.S.C. §§ 1343 & 1349);** <br> 3. **RICO VIOLATIONS (18 U.S.C. § 1962 et seq.);** <br> 4. **THEFT (CAL. PENAL CODE § 496(c));** <br> 5. **BREACH OF FIDUCIARY DUTY;** <br> 6. **AIDING AND ABETTING; and** |

-1-

MANDEEP DHOAT, an individual,

Cross-Claimant,

v.

HARPREET WALIA, an individual; SEVENSECUR INC., a Delaware corporation; WAVESTRONG, INC., a California corporation; RAJ SEHRAI, an individual; THE BIT BAZAAR LLC, a California limited liability company; ERFAN IBRAHIM, an individual; MICHAEL BAILEY, an individual; and ROES 1 - 100, inclusive,

Cross-Defendants.

**7. FRAUD.**
**and**

**DEMAND FOR JURY TRIAL**

Case Removed To Federal Court: June 20, 2024

Judge: Hon. Jacqueline Scott Corley
Trial Date: None Set

Cross-claimant Mandeep Dhoat ("Dhoat" or "Cross-Claimant"), in his individual capacity and his derivative capacity as a shareholder of nominal cross-defendant WaveStrong, Inc., a California corporation ("WaveStrong"), alleges the following against cross-defendants Harpreet Walia ("Walia"); SevenSecur, Inc., a Delaware corporation, ("SevenSecur"); Raj Sehrai, an individual, ("Sehrai"); The Bit Bazaar LLC, a California limited liability company, ("TBB"); Erfan Ibrahim, an individual, ("Ibrahim"); Michael Bailey, an individual, ("Bailey"), and ROES 1 through 100, (collectively, "Cross-Defendants"):

## SUMMARY OF THE CASE

1.  At all times relevant to this Second Amended Cross-Complaint, Dhoat has been a shareholder of WaveStrong, a cybersecurity and data privacy consulting company. Dhoat owned 36.5% of WaveStrong's corporate shares from 2015 through September 2021, and presently holds a 24% interest in the company.

2.  Dhoat seeks to rescind his September 2021 sale to Walia of 12.5% of the total shares in WaveStrong because his signature on the Stock Purchase Agreement he signed on September 24, 2021 was obtained through deception. Dhoat claims that Walia procured said shares by concealing from Dhoat in the summer of 2021 a third party's $20 million offer to purchase WaveStrong where Walia had a fiduciary obligation as a

-2-

director and the CEO of WaveStrong to disclose this offer to shareholders. Had Walia disclosed this offer, which essentially promised each shareholder $200,000 for each percentage of ownership, Dhoat never would have sold 12.5 percent of WaveStrong to Walia for $1 million, which equates to $80,000 for each percentage of ownership. Had Walia complied with his fiduciary obligations, the 12.5 percent of WaveStrong Dhoat sold to Walia would have been worth $2.5 million, not the $1 million Walia paid Dhoat for these shares. Given Walia's fraud, Dhoat seeks rescission pursuant to California Civil Code § 1689(b)(1).

3.     Upon information and belief, based on documents produced in this action prior to removal to this Court, Cross-Defendants, Bailey Advisory Services CO, P.C., a defunct Colorado corporation owned by cross-Defendant Michael Bailey ("BASCO"), and Walia's wife, Mehbooba Walia (collectively, the "RICO Enterprise"), conspired in a RICO Enterprise that engaged in financial fraud perpetrated at the direction of Walia, which enterprise was intended to personally enrich Walia and SevenSecur at the expense of WaveStrong.

4.     As described in greater detail below, among its other services, WaveStrong provides its clients with highly-skilled information technology ("IT") professionals who are placed with clients for specific timeframes at an hourly rate of compensation paid to WaveStrong. WaveStrong locates such workers and retains their services for X dollars an hour and farms these workers out to its clients at a higher hourly rate offered by the client. WaveStrong makes money based on the difference between the rate it charges clients and the wage it pays to its outside IT professionals.

5.     For example, if IBM seeks a temporary IT professional from WaveStrong to perform certain work and is willing to pay WaveStrong $160 per hour for this worker, then WaveStrong locates a qualified professional and retains the services of this professional at a lower rate (*e.g.*, $100/hour). WaveStrong then farms this professional out to IBM and makes $60 per hour worked given the difference between the rate

-3-

charged to IBM and the wage paid to this professional.

6. On information and belief, on August 28, 2020, Walia incorporated SevenSecur in Delaware. In November 2020, Walia registered SevenSecur to do business in California. Walia and the other cross-defendants then conspired to essentially steal the bulk of WaveStrong's income from its transactions with its clients by interposing SevenSecur and/or other strawmen in between WaveStrong and the IT professionals WaveStrong would locate to fill positions required by its clients.

7. For instance, as describe herein at ¶ 76, in late 2021, IBM, through a subsidiary, requested certain IT professionals from WaveStrong to assist one of IBM's clients. Walia then sent an email to cross-defendant Raj Sehrai, WaveStrong's head recruiter since 2016 who was primarily responsible for WaveStrong's staffing and operational needs, requesting that Sehrai locate qualified candidates. However, instead of causing WaveStrong to hire the IT professionals to be farmed out to IBM's client by WaveStrong, which would mean the highest profit margin for WaveStrong, once Sehrai identified the workers to be farmed out to IBM, Walia caused cross-defendant Erfan Ibrahim, the CEO of cross-defendant The Bit Bazaar (TBB), to have TBB sign these workers. Walia then caused WaveStrong to contract with TBB for the services of these workers at a much higher rate than if WaveStrong had retained the services of these workers directly. The resulting illicit profit of $142,000 obtained by TBB through this fraudulent scheme was then shared by the conspirators at WaveStrong's expense.

8. Where SevenSecur hired the workers identified by WaveStrong's head recruiter, Sehrai, in connection with this scheme, the deals were then routed through a strawman entity (either TBB or BASCO) to WaveStrong so that WaveStrong's other personnel and shareholders, including Dhoat, would not learn Walia and SevenSecur were profiting at WaveStrong's expense.

9. Dhoat has ascertained that, through this fraudulent scheme, the RICO Enterprise has stolen income from WaveStrong totaling at least $2,705,178 as of

-4-

February 2024. This theft was executed by manipulating corporate resources and engaging intermediaries (TBB/BASCO) to charge WaveStrong grossly-inflated rates for the services of IT professionals who WaveStrong otherwise would have hired directly at far lower rates of compensation. Additionally, as of February 2024, Walia also embezzled commissions from WaveStrong by submitting false claims for sales commissions payable by WaveStrong for the very resources implicated in the fraudulent scheme amounting to a total of $351,304.

10.    By engaging in such conduct, Cross-Defendants have violated (18 U.S.C. §1962(c) and conspired to violate (18 U.S.C. §1962(d)) of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  They also committed common law fraud, breach of fiduciary duty, and civil theft under Penal Code §496(c).

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1441, *et seq.*, in that Walia removed this former state court action to this Court based on federal question jurisdiction, as this action arises, in part, under RICO.

12.    This Court has supplemental jurisdiction over Cross-Claimant's related state law direct and derivative claims under 28 U.S.C. § 1367 because these claims arise under the same common nucleus of facts as the RICO claims asserted herein.

13.    This Court has personal jurisdiction over the Cross-Defendants, and each of them, because at all relevant times they were present in, doing business in, operating their principal place of business in, directing their efforts toward, employed within, and/or residing in this District.  This Court has personal jurisdiction over the Cross-Defendants, and each of them, for the additional reason that each of them purposefully directed actions at this forum to obtain benefits from their fraudulent scheme perpetrated against WaveStrong in this District.  The exercise of jurisdiction over the Cross-Defendants, and each of them, is reasonable because each of them conspired with each other to defraud WaveStrong in this District.

14.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims occurred in this district, and in that Dhoat's and WaveStrong's losses were suffered in this district.

## THE PARTIES

15.    Cross-claimant Dhoat resides and does business in Alameda County, California.

16.    Nominal cross-defendant WaveStrong is a California corporation, a leading enterprise in cloud information security services and a consulting company.

17.    Upon information and belief, cross-defendant Walia resides and does business in the County of Alameda, California. Walia is a member of and majority interest holder in cross-defendant SevenSecur, serving as its Founder, Majority Shareholder, Chief Executive Officer, Secretary, and Chief Financial Officer. Walia is also the Majority Shareholder, Chairman of the Board and Chief Executive Officer of WaveStrong.

18.    On information and belief, SevenSecur is a Delaware corporation owned and controlled by Walia. On information and belief, cross-defendants Walia and SevenSecur are, and at all relevant times were, the alter ego of one another, such that respecting the corporate form would permit injustice and a fraud upon WaveStrong.

19.    Cross-defendant Raj Sehrai ("Sehrai") has been serving as the full-time head recruiter at WaveStrong since 2016 and is primarily responsible for WaveStrong's staffing and operational needs. Upon information and belief, Sehrai received a commission for each hour billed by a resource he identified and recruited for WaveStrong. Sehrai would use a WaveStrong contractor database or third-party vendors to match customer job opportunities with suitable candidates. Typically, once Walia sent Sehrai a customer's job description, Sehrai would return potential candidates with their costs, and Walia would present those candidates to the customer. Upon customer approval, Sehrai facilitated the contractor's onboarding.  After the formation

-6-

of SevenSecur, Sehrai covertly served as its head recruiter while still in his role at WaveStrong, earning approximately $137,000 in 1099 compensation from SevenSecur in addition to his WaveStrong salary and commissions. He recruited resources for Walia and/or SevenSecur that were then redirected through BASCO and TBB to WaveStrong. All the conduct of Sehrai, as alleged in this Cross-Complaint, took place during his employment and/or agency relationship with WaveStrong.

20.     Cross-defendant The Bit Bazaar LLC ("TBB") is a California limited liability company, with its principal place of business at 2309 Nova Way, Corona, CA 92883.

21.     Cross-defendant Erfan Ibrahim ("Ibrahim") is the owner and the only manager and member of TBB.   Ibrahim is also a close friend of Walia.  Prior to 2020, WaveStrong had never made any payments to TBB. However, coinciding with the above-described fraudulent scheme, the RICO Enterprise diverted over $2.4 million to TBB between January 2020 and February 2024.

22.     Non-party and Rico Enterprise participant Bailey Advisory Services CO, P.C. ("BASCO") is a defunct small accounting firm based in Colorado, owned by cross-defendant Michael Bailey, a CPA lacking cybersecurity consulting experience. During the period in question, Bailey was BASCO's sole employee. On information and belief, Walia and Bailey exploited BASCO as a pass-through entity for billing to conceal the misappropriation of profits from WaveStrong.

23.     The true names and capacities of the cross-defendants, ROES 1 through 100, whether individual, corporate, associate or otherwise, are unknown to Cross-Claimant at the time of filing of this Cross-Complaint and Cross-Claimant, therefore, sues said cross-defendants by such fictitious names and will ask leave of court to amend this Cross-Complaint to show their true names or capacities when the same have been ascertained.  Cross-Claimant is informed and believes, and therefore alleges, that each of the ROE cross-defendants is, in some manner, responsible for the events and

happenings herein set forth and proximately caused injury and damages to Cross-Claimant and WaveStrong as herein alleged.

24.   Dhoat is informed and believes, and on that basis alleges, that each member of the RICO Enterprise, including each of the ROE cross-defendants, was the agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative and/or associate of each cross-defendant, and was at all times relevant herein acting within the course and scope of his, her or its authority as agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative and/or associate, and with the knowledge, authorization, consent, permission, and/or ratification of each cross-defendant.  On information and belief, all actions of each member of the RICO Enterprise alleged herein were ratified and approved by the officers and/or managing agents of each cross-defendant, whether ROE or otherwise.

25.   Non-party Mehbooba Walia ("Mehbooba"), who participated in the Rico Enterprise, is Walia's spouse and currently serves as a member of the board of directors at WaveStrong.

## FACTUAL ALLEGATIONS

26.   Dhoat, a United States Marine Corp veteran with a disability, is a seasoned professional in the cybersecurity domain. With more than eighteen years of experience in technology and cybersecurity services, his expertise encompasses the development of comprehensive security solutions for numerous Fortune 500 companies. His achievements include the establishment and oversight of security operations centers, execution of cyber risk assessments, management of vulnerabilities, enhancement of information security protocols, and the provision of Level-3 incident response management in the wake of security breaches.

27.   In July 2007, Walia married Dhoat's cousin.

///

-8-

28.    In the summer of 2010, Walia approached Dhoat with a proposition to rejuvenate WaveStrong by inviting Dhoat to purchase part of the company and collaborate on the venture. At this time, WaveStrong was on the verge of insolvency. Its staff had dwindled down to two full-time employees, including Walia himself, and the company's revenue for that year, mostly generated from customer payments for services rendered by Walia and the other employee, barely reached the low six figures.

29.    In October of 2010, Dhoat invested $152,000 in WaveStrong, securing 49% of the company's shares. WaveStrong was then valued at $310,204 in total. This investment marked a turning point for the company.

### A.    2010-2019: Dhoat's Contributions Kickstart WaveStrong Revival.

30.    In mid-2011, WaveStrong secured its first IBM contract to deliver 24/7 Security Operations Center (SOC) services to a Healthnet client based in Sacramento. Faced with financial constraints, WaveStrong initially recruited less technically skilled professionals. However, Dhoat dedicated extensive after-hours efforts to upskill these team members in SOC services, enabling WaveStrong to serve its first client with substantial profit margins. This successful partnership with Healthnet spanning three years not only solidified WaveStrong's relationship with IBM but also facilitated WaveStrong's accreditation as an IBM partner—a distinction that holds significant value, potentially amounting to several million dollars in today's market. Moreover, the lucrative margins from WaveStrong's dedicated service to Healthnet provided a vital revenue stream for WaveStrong.

31.    To grow the company, WaveStrong's approach was to affirmatively respond to IBM and other Managed Service Providers (MSPs) whenever they inquired about WaveStrong's capability to supply services for specific technologies that were scarce in the market. From 2011 to 2019, Dhoat worked 14 to 16 hours per day, learning new technologies and subsequently training WaveStrong's internal team. This strategy enabled WaveStrong to continuously expand its portfolio of technology services,

-9-

further establishing our company's expertise and versatility.

32. From 2011 to 2019, Dhoat managed the entire WaveStrong technical team as WaveStrong's Chief Technology Officer (CTO). In addition to his managerial responsibilities, Dhoat was actively involved in new technology projects that generated an average of $500,000 in billing revenue annually, which directly contributed to the company's profits.

33. In December 2015, Rajesh Khanna, one of the plaintiffs in this action, caused his company, RNN, LLC ("RNN"), the other plaintiff in this action, to invest $1.2 million to secure a 25% ownership stake in WaveStrong. As part of this deal, Khanna became WaveStrong's COO and a member of its board of directors.

**B.    2015-2019: Events Lead to Dhoat's Forced Exit From WaveStrong.**

34. In mid-2015, the dynamics within WaveStrong's stakeholder relationships took a personal turn as Walia ended his marriage with Dhoat's cousin. Following this, in October 2015, Walia became engaged to Mehbooba, his current spouse.

35. In March 2016, Walia and Mehbooba married, notably excluding Dhoat from the guest list for both the wedding and reception festivities because Walia had previously been married to Dhoat's cousin.

36. By April 2016, Walia advised Dhoat that Mehbooba was adamant about Walia cutting off all connections with Dhoat, encompassing both professional and personal relationships. In the weeks that followed, Dhoat discovered that this directive extended to such an extent that Walia was prohibited from engaging in any work-related communications or calls in which Dhoat was a participant, including emails.

37. In mid-2016, Khanna intervened as a mediator, leading to a period of reduced tensions. This mediation effort enabled Walia to resume participation in work-related calls, with the unique condition that his wife be present beside him during these interactions. Mehbooba's involvement deepened to the point where she became a ubiquitous presence in the office. Dhoat recalls no instance from 2016 to 2021 when

-10-

Walia was present the office without Mehbooba accompanying him throughout the day, sitting in his CEO office. This arrangement extended to all professional engagements, ensuring that Mehbooba was present for any discussions with vendors or employees, whether these occurred within the office, in meeting spaces, or over voice calls.

38.     Despite the far-from-ideal circumstances, Dhoat remained committed to navigating through the challenging work environment. Dhoat dedicated countless hours and extensive travel to WaveStrong from 2011 to 2019, transforming WaveStrong from a modest operation with just two employees into a respected entity boasting over 50 employees and an annual revenue of $12-$14 million dollars. Dhoat's goal was to continue his professional journey with WaveStrong until retirement.

39.     In June 2019, the relationship between Walia and Khanna reached a point of contention when Khanna took issue with Walia's practice of drawing sales commissions directly from gross revenue without appropriate authorization and oversight. Walia's defiant stance sparked a verbal altercation between him and Khanna. By October 2019, the work environment had deteriorated to such an extent that Dhoat was concerned it might lead to the immediate disbandment of the company and the eventual parting of ways among the stakeholders.

40.     Reaching a breaking point, Dhoat decided to leave WaveStrong and start his own company. In November 2019, Dhoat established SafeAeon. From the outset, Dhoat ensured that SafeAeon did not in any way impact WaveStrong's operations.

**C.     2021-2023: Walia Attempts To Cheat Shareholders In Proposed Sale Of WaveStrong And Uses His Majority Interest To Conceal Fraud.**

41.     Under California law, corporate directors and officers owe fiduciary duties to the corporation and shareholders in the exercise of corporate powers. (See *Jones v. H.F. Ahmanson & Co.*, 1 Cal.3d 93, 108, 110 (1969); *Small v. Fritz Companies, Inc.*, 30 Cal.4th 167, 179 (2003) [it is "well established in California law" that directors and officers owe fiduciary duties to shareholders].) These duties are, generally, "to act with

-11-

honesty, loyalty, and good faith." (*Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal.App.4th 1020, 1037 (2009); *Remillard Brick Co. v. Remillard-Dandini Co.*, 109 Cal.App.2d 405, 419 (1952) ["[d]irectors owe a duty of highest good faith to the corporation and its stockholders"].)

42.    In early 2021, WaveStrong's shareholders (Walia (38.5 percent), Dhoat (36.5 percent) and Khanna (RNN's 25 percent)) were approached by Cerberus Cyber Sentinel Corp. ("Cerberus") about purchasing WaveStrong for $8.55 million. By June 2021, both Dhoat and Khanna (on behalf of RNN) were ready to sell WaveStrong to Cerberus for $8.55 million, which equated to $85,500 per percentage point of ownership, but Walia did not want to sell. To stop this deal, Walia approached Dhoat and leveraged their 11-year business relationship to get Dhoat to reject the deal.

43.    On information and belief, based on emails between Nautic representatives and Walia produced in this action prior to removal, and unbeknownst to Dhoat and Khanna, as of June 2021, Walia since December 2020 had been secretly negotiating with Nautic Partners, LLC, a private equity fund ("Nautic"), which was offering far more money for WaveStrong than Cerberus's $8.55 million. However, Walia did not disclose his negotiations with Nautic to Dhoat and Khanna (as RNN's representative) because he was trying to sweeten the Nautic deal for himself at the expense of WaveStrong's other shareholders.

44.    According to a January 2021 terms sheet imbedded in an August 18, 2021 email from Walia to Chris Esemplare ("Esemplare"), who pursuant to the terms sheet would become chairman of the board of directors of WaveStrong were it purchased by Nautic, the total value of the transaction would be $20 million. However, rather than having the full value of the purchase price paid to the three shareholders of WaveStrong, which would have resulted in each shareholder receiving $200,000 for each percentage point of ownership, Walia sought to keep the bulk of the money for himself by having most of the money conveyed to him in connection with his employment agreement to

-12-

stay on as the CEO of WaveStrong after the buyout. This included a $6 million signing bonus, a proposed $2 million performance bonus for 2022 and a retention bonus of $2 million in stock to be granted two years after the closing date.

45.     In a bullet point included in his August 18, 2021 email to Esemplare, Walia demanded that Nautic "[s]eparate my employment details and only share the components without the actual NUMBERS, from rest of the terms of the LOI that HW/MD/RK sign." In other words, in demanding that the letter of intent be structured this way, Walia intended to conceal from the other shareholders of WaveStrong the true and total value of the transaction so he could keep most of the money for himself. A true and correct copy of the email string containing Walia's August 18, 2021 email to Esemplare is attached hereto as Exhibit 1 and incorporated herein by reference.

46.     Given Walia's roles in 2021 as the CEO of WaveStrong and a member of its board of directors, Walia breached his fiduciary obligations owed to WaveStrong shareholders Dhoat and RNN by engaging in this conduct. Had Walia acted with honesty, loyalty and good faith toward WaveStrong's other shareholders in connection with the Nautic offer as required under California law, WaveStrong would have been sold to Nautic for $20 million and Dhoat would have received $7.3 million for his 36.5 percent of the company. Dhoat and RNN were already willing to sell their shares to Cerberus in June 2021 for far less money. Had Walia not decided to engage in self-dealing, all three shareholders would have made a substantial return on their WaveStrong shares and this lawsuit never would have been filed by Khanna and RNN.

47.     As part of his efforts in June 2021 to get Dhoat to reject the Cerberus offer, Walia promised to purchase all of Dhoat's WaveStrong shares for the same price offered by Cerberus. However, this purchase never took place. Instead, in September 2021, after telling Dhoat and Khanna that Nautic was interested in purchasing WaveStrong, but while still concealing the true nature of the Nautic offer from Dhoat and Khanna, Walia purchased 12.5 percent of WaveStrong from Dhoat for $1 million, or $80,000 per

percentage of ownership. Dhoat now seeks to rescind this contract based on fraud in the inducement. A true and correct copy of the Stock Purchase Agreement memorializing this September 2021 transaction is attached hereto as Exhibit 2 and incorporated herein by reference.

48.     Having acquired an additional 12.5 percent of WaveStrong stock from Dhoat, Walia's ownership increased to a controlling 51% interest in WaveStrong.

49.     On October 18, 2021, Walia sent a text to Dhoat, telling him, in part, that the "LOI from Nautic has arrived.. Its (sic) for $8.5M… I will sign and send to you for review and signatures…." This text, like the LOI that followed, failed to disclose the true size and nature of the Nautic offer. Khanna refused to sign the LOI because he was concerned that both Walia and Dhoat were cheating him and he wanted to see the documents underlying certain WaveStrong transactions. Walia refused.

50.     In December 2021, Walia was continuing to push the Nautic deal, but Khanna refused to discuss signing a LOI for the sale of the company until Walia furnished Khanna documents related to several questionable transactions in the company's financial records. Walia refused to provide the demanded documents. Additionally, as part of the Nautic discussions, Walia was demanding that Khanna sign a broad release that would cover the very questionable transactions about which Khanna demanded to see documents. Walia's refusal to furnish Khanna with the demanded documents is what led Khanna to file this action and what ultimately doomed Nautic's proposed purchase of WaveStrong. Walia fired Khanna as COO the same month.

51.     This action was filed in the Alameda County Superior Court on May 25, 2022 against Walia, SevenSecur, WaveStrong, Dhoat and his company, SafeAeon. In March 2023, Khanna shared with Dhoat an email thread dating back to October 2021, in which Nautic discussed with Walia its intent to acquire WaveStrong for $20 million. This disclosure revealed Walia's deceit in connection with his purchase of part of Dhoat's stake in the company, which Walia had acquired at $80,000 per percentage

-14-

point in September 2021, fully cognizant that he could potentially resell each percentage of Dhoat's stake for $200,000 shortly thereafter.

52. By April 2023, Khanna and Dhoat agreed that they were both victims of Walia's deception. Recognizing that they held nearly equal stakes in WaveStrong, it became clear that any funds embezzled by Walia would adversely affect their financial interests and the overall valuation of the company in equal measure. Consequently, Khanna and Dhoat decided to settle their legal dispute.

53. In July 2023, Khanna (and RNN) settled their claims in this action against Dhoat and SafeAeon. The agreed-upon high-level terms of the settlement included:

a. Restoring financial control of WaveStrong to its Board of Directors, ensuring adherence to proper corporate governance procedures;

b. Conducting a thorough review of all contracts and business dealings between WaveStrong and Walia (including his associated entities) to assess their legality;

c. Initiating a comprehensive accounting audit to investigate any potential financial irregularities or misconduct;

d. Ensuring full financial and transactional transparency for the Board of Directors by providing direct access to WaveStrong's QuickBooks and bank accounts;

e. Evaluating and potentially revising Walia's compensation package to align it with industry standards and performance metrics; and

f. Investigating all financial transactions involving BASCO or any other entities or individuals directly or indirectly connected to Walia.

54. On August 3, 2023, Dhoat and Khanna convened a meeting of WaveStrong's Board of Directors, during which the action items listed above were adopted.

///

-15-

55.    Aware of the extent of the fraud he had perpetrated, Walia attempted to prevent this meeting from taking place. When he was unable to stop the August 3, 2023 meeting, he organized a Stakeholders' meeting on August 7th, 2023. Leveraging his majority stake of 51% acquired through dubious means, he executed the following actions:

    a.    Walia annulled all decisions that were passed during the August 3, 2023 meeting;

    b.    Walia removed Dhoat from his position as a Director of WaveStrong; and

    c.    Walia appointed his wife, Mehbooba, as a Director of WaveStrong.

56.    These actions by Walia as the majority shareholder constitute separate breaches of fiduciary duty. "[M]ajority shareholders, either singly or acting in concert to accomplish a joint purpose, have a fiduciary responsibility to the minority and to the corporation to use their ability to control the corporation in a fair, just, and equitable manner. Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority. Any use to which they put the corporation or their power to control the corporation must benefit all shareholders proportionately and must not conflict with the proper conduct of the corporation's business." (*Jones*, *supra*, 1 Cal.3d at p. 108.) Even in the context of the decision to dissolve a corporation, directors and controlling shareholders may not, consistent with their fiduciary duties, approve a dissolution that works a fraud upon or " 'freeze[s] out' " minority shareholders. (*In re Security Finance Co.,* 49 Cal.2d 370, 377 (1957).) In taking the actions that he took on August 7, 2023, Walia breached the fiduciary duties he owed to WaveStrong and its minority shareholders, Dhoat and RNN.

57.    After August 7, 2023, the WaveStrong Board of Directors was comprised of Walia, his wife, Mehbooba, and Khanna, with Walia holding 51% of the shares of WaveStrong. Walia controlled the WaveStrong Board of Directors. Any effort by Dhoat to have the Board of Directors cause WaveStrong to bring an action against Walia and

-16-

the other cross-defendants in connection with the wrongful conduct at issue here would have been pointless, thus demonstrating demand futility as required under Fed.Rule.Civ.P. 23.1. Given that Walia removed this action to this Court based on federal question jurisdiction, this action can in no way be deemed collusive.

58.    In August 2023, following persistent demands, Walia granted QuickBooks access to both Khanna and Dhoat. An exhaustive review of the QuickBooks records, along with documents produced during discovery by WaveStrong, TBB, BASCO, and SevenSecur in February of 2024, enabled Dhoat to uncover that between 2020 and January 2024, Walia embezzled millions of dollars through the RICO Enterprise.

D.    **Evidence of the Predicate Acts Perpetrated by the RICO Enterprise.**

59.    The RICO Enterprise made liberal use of interstate wire to communicate by email in furtherance of their fraudulent scheme (the "Predicate Acts").

60.    Walia's fraudulent scheme dates back to January 2020, when a project inquiry from a client led WaveStrong to engage services facilitated by TBB. Ibrahim, TBB's CEO, introduced Rob Noeth as a candidate to fulfill this project, commanding an hourly rate of $140. Subsequently, in April 2020, Greg Ake was also brought onboard to contribute to a different WaveStrong project, with his services being billed at the identical rate of $140 per hour. This billing rate of $140 per hour for both men immediately raised concerns, as it significantly exceeded the usual billing rate WaveStrong had paid for projects outsourced to its vendors since January 2019.

61.    Dhoat contends that Walia's routing of the hiring of these professionals through TBB marked the start of the RICO Enterprise. Through this arrangement, Walia initially collaborated with Ibrahim and, following the establishment of SevenSecur, with Michael Bailey and BASCO in addition to Ibrahim and TBB, to funnel IT professionals to WaveStrong via strawmen at inflated rates. This scheme effectively diverted profits from WaveStrong without the awareness of its shareholders or Janet Anderson, WaveStrong's Finance Manager, who handled client billing for WaveStrong.

-17-

62.     In June 2020, TBB hired Walia's brother-in-law, Mohammed Watloo ("Watloo"), to work as a SOC analyst in WaveStrong's Security Operations Center (SOC) remotely from Dubai. This arrangement was a façade created for the sole purpose of diverting WaveStrong funds and causing harm to WaveStrong. From August 2020 through January 2024, Walia caused Watloo to be billed to WaveStrong through TBB for 168 hours monthly—the equivalent of full-time employment— for a total sum of $209,000. These invoices falsely described him as serving as a Security Operations Center Analyst for WaveStrong. A review of documents produced by SevenSecur reveal that although Mohammed Watloo was being paid through TBB as a contractor for WaveStrong, he was actually working in the UAE as a salesperson for SevenSecur-FZ LLC, another of Walia's ventures. His role involved promoting SevenSecur-FZ LLC's services in the Middle East, not fulfilling SOC analyst duties at WaveStrong.

63.     After field testing his fraudulent scheme through TBB's role as a billing intermediary, Walia recognized that his business partners (Dhoat and Khanna) and WaveStrong's Finance Manager, Janet Anderson, remained oblivious to the embezzlement of funds. Walia then significantly escalated his fraudulent activities from the fourth quarter of 2020 onwards, continuing unabated through at least February 2024.

**(i)  Diversion of WaveStrong Profits via SevenSecur and BASCO**

64.     On August 28, 2020, Walia founded SevenSecur. In this action, Walia has repeatedly denied SevenSecur's role in stealing WaveStrong's profits, including in his February 2023 response to Form interrogatory No. 16.2 in this action before removal:

> SevenSecur does not compete with WaveStrong.  It was formed to build a data protection platform (SaaS) and associated services that do not compete.  It was formed for future endeavors and does not presently operate.  SevenSecur has had no dealings or transactions with WaveStrong, and it has not pursued any business opportunities that could have been brought to WaveStrong.

///

-18-

65.    On September 21, 2020, IBM requested a resource from WaveStrong not to exceed $165 per hour.  On September 22, 2020, after identifying Sumit Ahuja ("Sumit") at a rate of $100 per hour from the existing WaveStrong database, Sehrai forwarded Sumit's resume to Walia.  Subsequently, Walia presented a quote to IBM, billing Sumit's services at $160 per hour, totaling $50,400.

66.    As CEO of WaveStrong, had Walia fulfilled his fiduciary responsibilities owed to WaveStrong and its shareholders, he would have directly contracted Sumit through WaveStrong. This arrangement would have resulted in a profit of $18,900 for WaveStrong—the difference between Sumit's contract rate of $100 per hour and the $160 per hour rate billed to IBM. But, in a clear breach of the fiduciary duties he owed to WaveStrong and its shareholders as CEO, Walia instructed Sehrai to route Sumit's contract through SevenSecur, aiming to reassign him to WaveStrong via BASCO at an inflated rate of $145 per hour, thus reducing WaveStrong's profit for Sumit's services from $18,900 to $4,725.

67.    On October 9, 2020, SevenSecur finalized a Master Service Agreement (MSA) with Sumit Ahuja's Split Horizon, establishing a service rate of $95 per hour.

**MASTER CONTRACTOR AGREEMENT**

**Identification.** This Master Contractor Agreement ("Agreement") is entered into as of October 9, 2020 ("Effective Date"), by and between SevenSecur Inc., a Delaware Corporation, with its principal place of business at 539 Wycombe Court, San Ramon, CA - 94583, ("SevenSecur") and Split Horizon Consulting with its principal place of business at 666 Greenwich St. PH 25, New York, NY - 10014 ("Company").

SEVENSECUR_00009934

4.    **FEES**
Fees / Rates:        $95/hr – C2C

IN WITNESS WHEREOF, the parties hereto have mutually agreed upon and executed this Order as of the Effective Date.

SevenSecur, Inc.                    Split Horizon Consulting

By: _____            By: _Sumit P. Ahuja_
Patrick Bailey                        Name: Sumit Ahuja
CTO                                  Title: President

SEVENSECUR_00009944

-19-

68.    On October 9, 2020, WaveStrong and BASCO signed a Master Contractor Agreement (MCA). Walia strategically postponed this crucial phase of his scheme—integrating BASCO into his plans—until Sumit's Statement of Work (SOW) with IBM was finalized. The formalization of Sumit's SOW between WaveStrong and IBM was essential for setting up an MCA with BASCO.  Notably, Walia managed to secure Sumit's services at $95 per hour via SevenSecur but directed Sehrai to draft a WaveStrong-BASCO MCA indicating an hourly rate of $145 for Sumit.

69.    Sehrai, fully complicit in Walia's scheme, deceived Finance Manager Janet Anderson into initiating an order to onboard Sumit through BASCO at an inflated rate of $145 per hour, despite knowing Sumit was originally found at $95 an hour:

From:       Raj Sehrai
Subject:    Draft Offer C2C:
To:         Harpreet Walia
Sent:       October 9, 2020 9:07 PM (UTC+00:00)
Attached:   w-9-Basco.pdf

This is what I am sharing with Janet to prepare the MCA. Please review 1st.

Please prepare the Draft offer, thank you.

Please prepare: See attached W9

Please  share info with Employer only.

Client: IBM-Cleveland Clinic
Candidate Name: Sumit Ahuja
Title: Sr. Cisco Architect
Start Date: TBD
Email: sumit_ahuja@usa.net
Phone: 646-406-1386
Location: Remote
Pay Rate: $145/hr                    WALIA 0013311
Duration: 280 hours

70.    On October 11, 2020, SevenSecur entered into a Billing Proxy Agreement with BASCO. Walia, foreseeing the potential to reroute significant revenues from WaveStrong to SevenSecur, signed a LOI on October 11, 2020 to acquire BASCO, and appointed BASCO as a billing intermediary for SevenSecur's client transactions. According to the terms of the proxy agreement, BASCO was to transfer all proceeds from cybersecurity services directly to SevenSecur, with no deductions for expenses unless explicitly authorized by SevenSecur. This arrangement formally introduced

-20-

BASCO as a strawman, allowing SevenSecur to supply staff to WaveStrong through BASCO while concealing the actual source of the personnel – SevenSecur – from WaveStrong's Finance Manager and shareholders Dhoat and Khanna (RNN).

71.    On October 12, 2020, following the execution of the proxy agreement, Walia contracted Sumit back to WaveStrong through BASCO at a rate of $145 per hour.



This arrangement resulted in the redirection of $50 per hour from WaveStrong's profits for each hour Sumit worked at IBM to BASCO. According to the Billing Proxy Agreement, BASCO was obligated to transfer these funds to SevenSecur without retaining any portion of the profits.

72.    On October 8, 2020, IBM reached out to Walia requesting the addition of a Junior resource to the same Cleveland Project involving Sumit Ahuja. Sehrai, utilizing the WaveStrong database, identified Vinathi Peruri ("Vinathi") as a fitting candidate and relayed this information to Walia, who then forwarded Vinathi's details to IBM for approval.

73.    On October 14, 2020, after receiving IBM's nod to onboard Vinathi, Walia replicated the strategy used with Sumit by working alongside Sehrai to have Vinathi contracted through SevenSecur, bypassing a direct engagement with WaveStrong. Once

-21-

again, Sehrai, fully complicit in the fraudulent scheme, deceived Janet Anderson into initiating an order to onboard Vinathi through BASCO at an inflated rate of $120 per hour, despite knowing Vinathi was originally found at $65 per hour. Anderson, unaware that Walia's other company, SevenSecur, was the actual source of the resource and that BASCO was simply a strawman intended to conceal SevenSecur's role in the deal, initiated the order to BASCO at the inflated rate. This arrangement resulted in the redirection of $55 per hour from WaveStrong's profits for each hour Vinathi worked at IBM to BASCO. Pursuant to the Billing Proxy Agreement, BASCO was obligated to transfer these funds to SevenSecur without retaining any portion of the profits.

74.    On October 10, 2020, IBM reached out to WaveStrong requesting the staffing of three resources. Following the established pattern, Walia again chose not to hire directly through WaveStrong. Instead, he contracted the three resources—Barry ($60/hour), Rich ($60/hour), and Saket ($86/hour)—through SevenSecur. These individuals were then contracted back to WaveStrong via BASCO at inflated rates—Barry and Saket at $160/hour each, and Rich at $115/hour—resulting in the embezzlement of **$118,000** in WaveStrong profit. And again, Anderson, unaware that Walia's other company, SevenSecur, was the source of the resources and that BASCO was being used as a strawman, initiated the order to BASCO at the inflated rate.

75.    Between September 2020 and February 2024, the method devised by Walia and Sehrai in SevenSecur's initial three months of operation was replicated **24 times**. This routine involved IBM seeking staffing from WaveStrong, Sehrai sourcing the candidates, and Walia then hiring them via SevenSecur, bypassing a direct engagement with WaveStrong, to contract the resources back to WaveStrong through BASCO at higher rates. This scheme led to a total embezzlement of **$1,865,597** from WaveStrong.

///

///

-22-

Verified Second Amended Cross-Complaint;
Case No. 3:24-cv-03716-JSC

**(ii) Diversion of WaveStrong Profits with Walia conspiring with Ibrahim and TBB**

76.    To mitigate suspicion and potential red flags, Walia similarly employed TBB, distributing staffing opportunities between these two billing intermediary companies. However, the core fraud mechanism remained unchanged. The only distinction between the operations with BASCO and TBB was the specific company employed as the billing proxy, with all other facets of the fraudulent scheme remaining consistent.  Below are a few case studies illustrating how the fraudulent mechanism involving TBB mirrored exactly the approach used with BASCO:

**Case Study #1:  Tom Chang and Nathan Anandan: Total Profit Siphoned from WaveStrong: $142,000**

In this case study, documentary evidence shows how Walia and Sehrai conspired together to divert $142,000 from WaveStrong through TBB acting as a billing proxy or strawman.



-23-

## Steps 1: IBM requests Resources from WaveStrong

From: Chris Mapes <mapes@us.ibm.com>
Date: December 21, 2021 at 6:54:33 AM PST
To: Ranjit K Balaram <rbalaram@us.ibm.com>
Subject: Security Services Urgent Staffing Request: 3 Security Services IAM Postions: NYC Bar Account

WaveStrong 0130414

Team - good morning

IBM Security Services has an urgent staffing need for 3 Security Services IAM positions for a NYC bank account. positions will be staffed as immediately as possible.

## Step 2: Walia Delegates Resource Discovery to Sehrai via Email

From: Harpreet Walia <Harpreet@wavestrong.com>
Sent: Tuesday, December 21, 2021 7:41 AM
To: Raj Sehrai <r.sehrai@wavestrong.com>; Saket Kaushik <s.kaushik@wavestrong.com>
Subject: Fwd: Security Services Urgent Staffing Request: 3 Security Services IAM Postions: NYC Bank Account

Best Regards,

Harpreet S. Walia

WaveStrong 0130414

## Step 3: Sehrai Identifies Resources and Responds to Walia via Email

From: Raj Sehrai </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=79B1692DFAAF488A9005844941DFB46C-R.SEHRAI>
To: Harpreet Walia; Saket Kaushik
Sent: 12/22/2021 5:34:42 PM
Subject: RE: Security Services Urgent Staffing Request: 3 Security Services IAM Postions: NYC Bank Account
Attachments: Sreekanth Rachamadugu-IAM SMEnc.doc; Tom Chang-IAM SMEnc.docx

Name: Tom Chang – Cost: $90/hr C2C
Current Location: LA
Availability: 2 weeks
No. of Year of experience: 15 plus years of experience in IAM space including 4 plus with Okta development integration.
Hourly Bill Rate to IBM:

Regards,

WaveStrong 0130394

Raj Sehrai | Manager, Talent Acquisition |
Cell: 213.216.6231

WaveStrong, Inc

From: Raj Sehrai </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=79B1692DFAAF488A9005844941DFB46C-R.SEHRAI>
To: Harpreet Walia
Sent: 12/23/2021 9:33:52 PM
Subject: RE: Security Services Urgent Staffing Request: 3 Security Services IAM Postions: NYC Bank Account
Attachments: Thanigainathan Anandan-IAM SMEnc.docx

Name: Thanigainathan (Nathan) Anandan – Cost: $120/hr C2C
Current Location: VA
Availability: 2 weeks
No. of Year of experience: Over 17 plus year of experience in IAM solutions, SAML, Okta, Rest API, and 1 plus years of experience deploying & building large scale Web Applications.
Hourly Bill Rate:
Regards,

Raj Sehrai | Manager, Talent Acquisition |
Cell: 213.216.6231

WaveStrong, Inc

WaveStrong 0130459

-24-

## Step 4: WaveStrong presents the resources back to IBM



## Step 5: Walia conspires with TBB to Contract Tom ($90) and Nathan ($120)



-25-

IN WITNESS WHEREOF, COMPANY and Consultant have caused this Agreement to be signed by their dul authorized officers the day and year first above written.

COMPANY                                                    Consultant

By: _____                                       By: _____

Name: Dr. Erfan Ibrahim                                   Name: Tom Chang

Title: Founder & CEO                                      Title: CEO

The Bit Bazaar LLC                                        Email: ttkchang@hotmail.com

Phone: (925) 785-5967                                     Date: January 7, 2022

Date: January 7, 2022                                     02/12/2024
                                                          Scanned with CamScanner

This invoice is for Work done during the month of January, 2022

| | | | Term | Project |
|---|---|---|---|---|
| | | | Net 30 | Wavestrong/IBM |
| Consultant Name | Hours | Period | Rate | Amount |
| Tauk Chang | 40 | 1/24-1/28 | 90 | 3600 |
| | 8 | 1/31 | 90 | 720 |
| | | | | 02/12/2024 |
| | | | | TBB000060 |

## Step 6: TBB PROXY back to WaveStrong: Tom ($125) and Nathan ($155)

Account Name: The Bit Bazaar LLC          02/12/2024          Attn: Accounts Payable
                                          TBB000310           WaveStrong Inc,
The Bit Bazaar LLC                                            5674 Stoneridge Dr, Suite 225
1021 Golf Court                                              Pleasanton, CA 94588
Mountain View, CA 94040
Tel: (925) 785-5967                                          Tel: (844) 299-8264
E-mail: erfan@tbbllc.com                                     Email: janet@wavestrong.com

Make Checks Payable to: The Bit Bazaar LLC                   WaveStrong Contact: Janet Anderson

Consulting Costs

| Item # | Type | Description | Time (hours) | Rate $/hr. | Price |
|---|---|---|---|---|---|
| 1 | Consulting Time | Consulting time for Tauk Chang on IBM MUFG Project | 152 | $ 125.00 | $ 19,000.00 |
| | Consulting Total | | | | $ 19,000.00 |

Account Name: The Bit Bazaar LLC          02/12/2024          Attn: Accounts Payable
                                          TBB000234           WaveStrong Inc,
The Bit Bazaar LLC                                            5674 Stoneridge Dr, Suite 225
1021 Golf Court                                              Pleasanton, CA 94588
Mountain View, CA 94040
Tel: (925) 785-5967                                          Tel: (844) 299-8264
E-mail: erfan@tbbllc.com                                     Email: janet@wavestrong.com

Make Checks Payable to: The Bit Bazaar LLC                   WaveStrong Contact: Janet Anderson

Consulting Costs

| Item # | Type | Description | Time (hours) | Rate $/hr. | Price |
|---|---|---|---|---|---|
| 1 | Consulting Time | Consulting time for Thanigainathan (Nathan) Anandan on IBM MUFG Project | 48 | $ 155.00 | $ 7,440.00 |
| | Consulting Total | | | | $ 7,440.00 |

## Total Profit Siphoned from WaveStrong (Tom and Nathan): $142k

| Name | Original Rate | PROXY RATE | Profit Siphoned / hour | Hours Billed | Total Profit Siphoned |
|---|---|---|---|---|---|
| Nathan Anandan | $120 | $155 | $35 | 2472 | $86,520 |
| Nathan Anandan | $100 | $125 | $25 | 324 | $8,094 |
| Tom Chang | $90 | $125 | $35 | 1350 | $47,242 |

### Case Study #2: Lilli Technology Raises Concerns About TBB's Involvement

This case study highlights a notable instance of this practice, where to meet IBM's requirements, Walia and TBB orchestrated the direct contracting of Sharath and

-26-

Bhargav at $72/hour each, subsequently routing their services back to WaveStrong at inflated rates of **$125/hour for Sharath** and **$137/hour for Bhargav**, utilizing TBB as a proxy billing or strawman.



However, this scheme encountered an obstacle when Lilli Technologies, a legitimate vendor for WaveStrong, raised concerns regarding TBB's intermediary role, questioning the necessity and legitimacy of TBB's involvement in the billing process between Lilli Technologies and WaveStrong:

From: PETE K <pete@lillitechnology.com>
Sent: Tuesday, September 13, 2022 11:38 AM
To: Raj Sehrai <r.sehrai@wavestrong.com>
Cc: HEATHER HAMANN <heather@lillitechnology.com>
Subject: Re: MSA with The Bit Bazaar LLC

Dear Raj
Greetings. I would like to bring to your kind attention on few important points. Upon the review of the contractual agreements by our immigration team they raised a few questions which need your clarification.

Lilli Technology LLC is a staffing and consulting firm which also handles the immigration activities and sponsors H1 visas to its employees. As you are aware USCIS has deep insight and is very particular on the documents we submit the applications for processing . To avoid the denials and RFE's  we need your clarification on the following discrepancies in the agreement:

What is the role of The Bit Bazaar LLC? Is it a layer between Lilli Technology and Wave strong Inc?

The address of The Bit Bazaar - 5727 W. Las Positas Bl, Apt 103, Pleasanton CA 94588 mentioned in the agreement looks like its operating from Residential apartments which USCIS may need more information on the business premises which leads to complex RFE.

As per our discussion you said, The Bit bazaar LLC handles contracts and invoices for wave strong Inc but nowhere in the agreement its business relation with Wave strong is established.

As per our discussion Wave strong Inc is the prime vendor and supplier for IBM and the letters will be provided by Wave strong. The connection is missing between the contractual agreements with Bit Bazaar and the letters provided by Wave strong Inc.

Is it possible to have contractual agreement directly between Lilli Technology and Wave strong Inc?

We respect your valuable suggestions and clarifications. please advise.

77.    From January 2020 to February 2024, the fraudulent strategy involving TBB as a strawman to divert WaveStrong's profits, was executed **14 times**. This process saw IBM requesting staff from WaveStrong, Sehrai identifying suitable candidates, and Walia subsequently contracting these individuals through TBB—sidestepping WaveStrong—to then contract the resources back to WaveStrong at inflated rates. This operation resulted in a total diversion of **$839,581** from WaveStrong.

78.    Walia's actions extended beyond embezzling profits from WaveStrong via rerouted staffing opportunities; he also diverted business from WaveStrong's existing vendors and customers directly to SevenSecur. By coercing them to transact directly with SevenSecur and bypass WaveStrong entirely, Walia put WaveStrong at risk of

-28-

losing millions in revenue and significantly diminishing its valuation.

79.    Based on the foregoing, the conduct of Cross-Defendants, along with BASCO and Mehbooba Walia, resulted in the formation of an associated-in-fact RICO Enterprise that, functioning as a unit, orchestrated and executed the embezzlement of over $3 million of WaveStrong's profits, in addition to hundreds of thousands of dollars in profits from other business opportunities that Walia wrongfully caused to be diverted entirely from WaveStrong to SevenSecur in breach of his fiduciary duties owed to WaveStrong.

## FIRST CLAIM FOR RELIEF

### Direct Claim for Rescission Of Contract Against Cross-Defendant Walia

### (On The Basis Of Fraud In The Inducement)

80.    Cross-Claimant repeats and realleges paragraphs 1 through 79 hereof, as if fully set forth herein.

81.    In September 2021, Walia offer Dhoat $1 million to purchase 12.5 percent of WaveStrong from Dhoat, which equated to $80,000 per each percentage ownership of the company.

82.    At the time he made this offer, Walia knew that Nautic was willing to pay upwards of $200,000 for each percentage of ownership.

83.    As the CEO and a member of the WaveStrong Board of Directors, Walia had a fudiciary obligation to disclose the Nautic offer and its terms to Dhoat.

84.    Rather than disclose this information, which Walia knew would be material to Dhoat's decision on whether or not to sell more than a third of his interest in WaveStrong to Walia, Walia concealed the true nature of the Nautic offer.

85.    Walia knowingly concealed the true nature of the Nautic offer to induce Dhoat to sell 12.5 percent of WaveStrong to Walia, which would give Walia a 51 percent controlling interest in WaveStrong.

-29-

86.    Had Dhoat been told that Nautic was willing to pay $20 million to purchase WaveStrong, Dhoat never would have signed Walia's Stock Purchase Agreement. Given their 11-year relationship as business partners, Dhoat justifiably and reasonably relied on Walia's material misrepresentations regarding the nature of the Nautic offer.

87.    As a result of Walia's wrongful conduct, Dhoat is entitled to rescind the September 2021 Stock Purchase Contract under California Civil Code § 1689(b)(1) for fraud in the inducement. Dhoat has been damaged by such conduct. Had Walia disclosed the true nature of the Nautic offer, Dhoat would have sold his entire interest in WaveStrong to Nautic for $7.3 million. Service of this Cross-Complaint and related pleadings constitutes notice of rescission of the September 2021 sales transaction.

88.    In engaging in the conduct complained of herein, Walia acted with a willful and conscious disregard of Dhoat's rights and with an intent to vex, injure and annoy so as to constitute malice, fraud and oppression as set forth in California Civil Code § 3294. Accordingly, Dhoat is entitled to recover, in addition to actual damages, punitive and exemplary damages in an amount to be appropriate to punish and make an example of Walia, as well as to deter Walia from engaging in similar conduct in the future.

89.    During the balance of this lawsuit, Dhoat will incur attorney fees and other litigation costs. Pursuant to the attorney's fees provision in the Stock Purchase Agreement, Dhoat seeks an award of attorneys' fees and other litigation costs incurred in connection with this action.

## SECOND CLAIM FOR RELIEF

### Derivative Claim For Wire Fraud Against All Cross-Defendants
### (18 U.S.C. §§ 1343 & 1349)

90.    Cross-Claimant repeats and realleges paragraphs 1 through 89 hereof, as if fully set forth herein.

91.    Cross-defendants Walia, SevenSecur, Sehrai, TBB, Ibrahim and Bailey, as well as non-party BASCO, represented to WaveStrong and to WaveStrong's Finance

-30-

Manager, Janet Anderson, that the transactions involving WaveStrong's contracting of IT professionals through TBB and BASCO were legitimate transactions for the benefit of WaveStrong, in order that WaveStrong and Anderson would not discover that the transactions were fraudulent and made for the purpose of enriching Cross-Defendants, and each of them.   After the transactions were discovered, Walia continued to misrepresent the nature of the transactions set forth herein in order to induce Cross-Claimant to forestall bringing this cross-action to litigate claims arising from this ongoing fraud.

92.   Cross-Defendants intended to misrepresent the purpose of the transactions in order to empower themselves to make payments to enrich Walia and the other cross-defendants.

93.   By repeatedly authorizing and causing the processing of transactions that stole WaveStrong's profits for the benefit of the Cross-Defendants, and by repeatedly accepting and receiving the stolen funds with knowledge that such funds were stolen, Cross-Defendants, and each of them, violated, are violating, and continue to violate 18 U.S.C. §§ 1343 and 1349.   Specifically, Defendants, and each of them, violated 18 U.S.C. §§ 1343 and 1349 by, without limitation:

a.   participating in each separate transaction whereby WaveStrong's profits were syphoned off for the benefit of Cross-Defendants;

b.   executing or conspiring to execute plans, schemes, or artifices to defraud WaveStrong via the banking system; and

c.   obtaining WaveStrong's money by means of false and fraudulent pretenses with the intent to defraud, including by requesting that WaveStrong contract with TBB and BASCO to retain the services of IT professionals who should have been contracted by WaveStrong directly, where Cross-Defendants intended to steal money that otherwise would have been WaveStrong's profits.

///

-31-

94.    Upon a showing that Cross-Defendants are committing or are about to commit wire fraud, conspiracy to commit wire fraud, or both, WaveStrong is entitled to a temporary restraining order, a preliminary injunction, and a permanent injunction restraining all future fraudulent conduct and other action that this Court deems just in order to prevent a continuing and substantial injury to WaveStrong.

95.    By reason of the foregoing, Cross-Defendants are liable in an amount three times greater than sum of at least $3,056,482, plus all consequential damages arising from Cross-Defendants' conduct, subject to proof at trial.  Cross-Defendants are also liable to Cross-Claimant for the costs of suit and for all reasonable attorneys' fees incurred by Cross-Claimant in pursuing this claim on behalf of WaveStrong.

## THIRD CLAIM FOR RELIEF

### Derivative Claim for RICO Violations Against All Cross-Defendants

### (18 U.S.C. § 1962, et seq.)

96.    Cross-Claimant repeats and realleges paragraphs 1 through 95 hereof, as if fully set forth herein.

97.    The conduct of Cross-Defendants alleged herein constitutes racketeering as set forth in 18 U.S.C. § 1964(c).  Specifically, Congress has defined "racketeering" to include wire fraud or committing fraud by means of electronic transmissions over wire.  Cross-Defendants have engaged in multiple instances of wire fraud in furtherance of the scheme complained of herein.

98.    As detailed below, Cross-Claimaint alleges three different species of RICO violation.  In summary, Section 1962(c) provides relief against parties who engage in a pattern of racketeering activity, Section 1962(a) provides relief against parties who use income generated through a pattern of racketeering activity, and Section 1962(d) provides relief against those who conspire to violate the racketeering laws.  Cross-Defendants are liable under each of these three sections of the statute.

///

-32-

99.    18 U.S.C. § 1964(c) allows "any person injured in his business or property by reason of a violation of section 1962 of this chapter" to "sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of suit, including a reasonable attorney's fee. . . ."

100.    At all times relevant herein, each cross-defendant conducted and participated in the affairs of an ongoing racketeering enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962.

101.    Plaintiff is informed and believes, and on that basis alleges, that Cross-Defendants formed and have since 2020 operated, conducted, and participated in the affairs of, and been enriched by, an association-in-fact that, through these interrelated businesses and accountancy operations, has targeted WaveStrong in order to steal from and defraud WaveStrong, and have thus established as part of their association-in-fact an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

102.    Cross-Defendants, and each of them, are "persons" who are knowing and active participants in, members of, and beneficiaries of that "enterprise."

103.    The "enterprise" complained of herein is an ongoing organization of people and entities controlled and directed by cross-defendant Walia that functions as a continuing unit, that was created by him and continues to operate, grow, and evolve to effectuate Cross-Defendants' pattern of racketeering activity targeting WaveStrong.

104.    Cross-Defendants' activities described above include at least thirty-eight (38) acts of racketeering activity since 2020.  Accordingly, Cross-Defendants' conduct constitutes a "pattern" of racketeering activity under 18 U.S.C. § 1961(5).

105.    Additionally, each of the 38 fraudulent transactions were events of wire fraud and of racketeering carried out by Defendants in furtherance of the enterprise.

**A.    Violation of 18 U.S.C. § 1962(c)**

106.    Cross-Claimant repeats and realleges each prior allegation as if fully set forth herein.

-33-

107.   18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  Each cross-defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each cross-defendant is capable of holding, and does hold a "legal or beneficial interest in property."

108.   Cross-Claimant is informed and believes, and on that basis alleges, that the wire frauds engaged in by Cross-Defendants complained of herein were in furtherance of the enterprise formed by Cross-Defendants to defraud WaveStrong.

109.   At all times relevant herein, Cross-Defendants have been involved in a plan or scheme to defraud; have had the intent to defraud; and have willfully participated in the scheme to defraud with actual knowledge of its fraudulent and criminal nature, and did foresee or could reasonably have foreseen that interstate wires would be used and were in fact used to further the scheme.

110.   Cross-Defendants engaged in and affected interstate commerce by way of said wire frauds.

111.   The wire transactions complained of herein were made in furtherance of Cross-Defendants' scheme and common course of conduct.

112.   To achieve their common goals, Cross-Defendants, and each of them, knowingly and willfully concealed from WaveStrong, its Finance Manager, Janet Anderson, and shareholders Dhoat and Khanna (RNN) the unlawfulness and true nature of their activities, including by misrepresenting TBB and BASCO as the true representatives of the relevant IT professionals to be contracted by WaveStrong to IBM.

113.   As a direct and proximate result of the conduct of Cross-Defendants, and each of them, WaveStrong has been injured in its business and property, causing

///

-34-

WaveStrong to suffer monetary damages in an amount not less than $3,056,482, subject to proof at trial.

114. Because of Cross-Defendants' violations of 18 U.S.C. § 1962(c), Cross-Defendants are liable to WaveStrong for three times the damages WaveStrong has sustained, and liable to Cross-Claimant for cost of suit and reasonable attorneys' fees.

**B.      Violation of 18 U.S.C. § 1962(a)**

115. Cross-Claimaint repeats and realleges each prior allegation as if fully set forth herein.

116. 18 U.S.C. § 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

117. As alleged above, at all relevant times each Cross-Defendant was, and is, a "person" within the meaning of 18 U.S.C. § 1961(3), and Defendants' conduct constitutes a "pattern" of racketeering activity under § 1961(5).

118. At all times relevant herein, beginning in 2020 and continuing at least through February 2024, Cross-Defendants received income derived from a pattern of racketeering activity to use or invest a part of such income or the proceeds of such income in the establishment and operation of an enterprise that is engaged in, or the activities of which effect, interstate commerce in violation of 18 U.S.C. § 1962(a).

119. Cross-Defendants, and each of them, received and used income derived from a pattern of racketeering activity to control, establish and operate the enterprise, which was and is engaged in and affects interstate commerce, including through wire fraud as alleged herein and for the unlawful purpose of intentionally defrauding WaveStrong.

120.    As a direct and proximate result of the conduct of Cross-Defendants, and each of them, WaveStrong has been injured in its business and property, causing WaveStrong to suffer monetary damages in an amount not less than $3,056,482, subject to proof at trial.

121.    Because of Cross-Defendants' violations of 18 U.S.C. § 1962(a), Cross-Defendants are liable to WaveStrong for three times the damages WaveStrong has sustained, and liable to Cross-Claimant for the cost of suit and reasonable attorneys' fees.

### C.    Violation of 18 U.S.C. § 1962(d)

122.    Cross-Claimant repeats and realleges each prior allegation as if fully set forth herein.

123.    18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

124.    As alleged above, at all relevant times each Cross-Defendant was, and is, a "person" within the meaning of 18 U.S.C. § 1961(3), and Cross-Defendants' conduct constitutes a "pattern" of racketeering activity under § 1961(5).

125.    At all relevant times, beginning in 2020 and continuing at least through February 2024, the Cross-Defendants, and each of them, agreed to and did conspire to violate 18 U.S.C. §§ 1962(a) and (c), as alleged above and incorporated herein, in violation of § 1962(d).  The object of this conspiracy has been and is to conduct or participate in and be enriched by, directly or indirectly, the conduct of the enterprise described above, to thereby receive income derived from a pattern of racketeering activity, and to use such income or the proceeds of such income in the establishment and operation of that enterprise.

126.    Cross-Defendants have knowingly, willfully and intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity (wire fraud).

-36-

127. Cross-Defendants knew that their actions alleged above were part of a pattern of racketeering activity and agreed to the commission of those acts to further the conspiracy and enterprise alleged herein.

128. Cross-Defendants, and each of them, have therefore conspired to violate 18 U.S.C. §§ 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

129. As a direct and proximate result of the conduct of Cross-Defendants, and each of them, WaveStrong has been injured in its business and property, causing WaveStrong to suffer monetary damages in an amount not less than $3,056,482, subject to proof at trial.

130. Because of Cross-Defendants' violations of 18 U.S.C. § 1962(d), Cross-Defendants are liable to WaveStrong for three times the damages WaveStrong has sustained, and liable to Cross-Claimant for the cost of suit and reasonable attorneys' fees.

## FOURTH CLAIM FOR RELIEF

### Derivative Claim for Theft Against the Individual Defendants

### (Cal. Penal Code § 496)

131. Cross-Claimant repeats and realleges paragraphs 1 through 130 hereof, as if fully set forth herein.

132. California Penal Code § 496(a) states "Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, [is guilty of theft]."

133. California Penal Code § 496(c) states that "Any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

-37-

134. Harpreet Walia, Raj Sehrai, Erfan Ibrahim and Michael Bailey (the "Individual Cross-Defendants"), and each of them, received WaveStrong's funds totaling $3,056,482, which were and are property that has been stolen from WaveStrong or that have been obtained from WaveStrong through the above-described fraud in a manner constituting theft.

135. The Individual Cross-Defendants, and each of them, knew at the time that each obtained WaveStrong's funds that those funds were stolen from WaveStrong.

136. The Individual Cross-Defendants, and each of them, withheld and concealed, and assisted each other in withholding and concealing WaveStrong's funds.

137. Through their ongoing participation in the fraudulent schemes to steal WaveStrong's profits, the Individual Cross-Defendants, and each of them, are estopped from claiming lack of knowledge that WaveStrong's funds were stolen.

138. Through their willing participation in the above-described fraudulent enterprise, the Individual Cross-Defendants, and each of them, are estopped from asserting lack of knowledge of the transactions by which the funds were stolen. Cross-Claimant is informed and believes, and on that basis alleges, that each assisted each other in carrying out and concealing those acts of theft.

139. Accordingly, WaveStrong has had at least $3,056,482 stolen from it by each of the Individual Cross-Defendants.

140. By reason of the foregoing, the Individual Cross-Defendants are jointly and severally liable to WaveStrong in an amount three times greater than the sum of at least $3,056,482, plus all consequential damages, subject to proof at trial. They are also liable to Cross-Claimant for costs of suit and reasonable attorneys' fees incurred by Cross-Claimant in pursuing this claim.

///

///

///

-38-

## **FIFTH CLAIM FOR RELIEF**

**Direct and Derivative Claims for Breach of Fiduciary Duty Against the Walia**

141.   Cross-Claimant repeats and realleges paragraphs 1 through 140 hereof, as if fully set forth herein.

142.   Cross-defendant Harpreet Walia, in his capacities as CEO and as a member of WaveStrong's Board of Directors, owed fiduciary duties to Dhoat, as a shareholder, as a matter of law.

143.   Walia breached the fiduciary duties owed to Dhoat in numerous respects, including, but not limited to:

a.   Failing to disclose Walia's December 2020 through December 2021 negotiations with Nautic concerning the potential purchase of WaveStrong;

b.   Failing to disclose the different sums that Nautic offered for the purchase of all of WaveStrong's stock between December 2020 and December 2021;

c.   Failing to disclose Nautic's willingness in September 2021 to pay $20 million to acquire all of WaveStrong's stock, which equated to $200,000 per percentage point of ownership, when Walia purchased 12.5 percent of WaveStrong from Dhoat in September 2021 for $1 million where this stock would have been worth $2.5 million under the proposed Nautic deal.

144.   Had Walia acted with honesty, loyalty, and good faith in his dealings with Dhoat and Khanna, as required under California law, when Nautic was interested in purchasing WaveStrong, and formally disclosed to these shareholders that Nautic was willing to pay $20 million to acquire the company, all three shareholders would have agreed to the sale and Dhoat would have sold his 36.5 percent stake in WaveStrong to Nautic for $7.3 million.

145.   As a proximate result of Walia's conduct alleged above, Dhoat has sustained monetary damages measured by the difference between $7.3 million and the current value of 36.5 percent of WaveStrong's stock minus the $1 million Walia paid

Dhoat for 12.5 percent of WaveStrong, plus interest thereon at the maximum rate permitted by law.

146. Cross-Claimant is informed and believes, and thereon alleges, that in performing the actions described above, Walia acted with malice, oppression and fraud as those terms are defined by California Civil Code Section 3294, and Walia carried out those actions with the intent to deprive Dhoat of his property interests. Dhoat is therefore entitled to punitive damages in a sufficient amount to make an example of and punish Walia, and deter future fraudulent, oppressive and malicious misconduct.

147. Cross-defendant Harpreet Walia, in his capacities as CEO and as a member of WaveStrong's Board of Directors, owed fiduciary duties to WaveStrong as a matter of law.

148. Walia breached the fiduciary duties owed to WaveStrong in numerous respects, including, but not limited to:

a. Using SevenSecur, TBB and BASCO to bilk WaveStrong of $3,056,482 in profits between 2020 and February 2024 by causing these other entities to contract IT professionals to be routed through WaveStrong to IBM when WaveStrong had the ability and opportunity to contract with these professionals directly at a much lower rate of compensation;

b. By diverting WaveStrong business opportunities to SevenSecur to enrich himself at the expense of WaveStrong;

c. By failing to disclose to WaveStrong's other officers and shareholders the conduct identified in subparagraph (a);

d. By failing to disclose to WaveStrong's other officers and shareholders the conduct identified in subparagraph (b);

e. By failing to reimburse WaveStrong for the monies stolen from it as a result of Walia's wrongful conduct;

///

-40-

f.      By using his majority interest in the company on August 7, 2023 to reverse the decisions made by the WaveStrong Board of Directors on August 3, 2023;

g.      By using his majority interest in the company on August 7, 2023 to remove Dhoat from the WaveStrong Board of Directors in an effort to conceal his wrongful conduct;

h.      By using his majority interest in the company on August 7, 2023 to add his wife, Mehbooba Walia, to the WaveStrong Board of Directors in an effort to conceal his wrongful conduct; and

i.      By concealing the true nature of the Nautic offer from his fellow shareholders.

149.   As a proximate result of Walia's conduct alleged above, WaveStrong has sustained monetary damages in excess of $3,056,482, plus interest thereon at the maximum rate permitted by law.  Cross-Claimant, as a shareholder of WaveStrong, seeks such damages on its behalf.

150.   Cross-Claimant is informed and believes, and thereon alleges, that in performing the actions described above, Walia acted with malice, oppression and fraud as those terms are defined by California Civil Code Section 3294, and Walia carried out those actions with intent to deprive WaveStrong of its property interests.  WaveStrong is therefore entitled to punitive damages in a sufficient amount to make an example of and punish Walia, and deter future fraudulent, oppressive and malicious misconduct.  Cross-Claimant, as a shareholder of WaveStrong, seek punitive damages on its behalf.

## SIXTH CLAIM FOR RELIEF

### Derivative Claim for Aiding and Abetting Against All Cross-Defendants

151.   Cross-Claimant repeats and realleges paragraphs 1 through 150 hereof, as if fully set forth herein.

152.   On information and belief, at all times relevant to the actions described above, cross-defendants Sehrai, SevenSecur, Ibrahim, TBB and Bailey had actual

-41-

knowledge of Walia's breaches of fiduciary duty, acts of theft, acts of wire fraud, and racketeering activity, and knowingly stood to benefit therefrom.

153. Cross-defendants Sehrai, SevenSecur, Ibrahim, TBB and Bailey aided and abetted and substantially assisted Walia's breaches of fiduciary duty, acts of theft, acts of wire fraud, and racketeering activity by, without limitation, participating in the fraudulent enterprise intended to divert WaveStrong's profits by routing the contracting of IT professionals through strawmen entities such that WaveStrong was charged much higher rates for the services of these professionals than if WaveStrong had contracted with them directly.

154. Similarly, at all times relevant herein, to the extent Harpreet Walia did not directly lead any of the wrongdoing alleged herein, then he aided and abetted all of the other cross-defendants, and each of their breaches of fiduciary duty, acts of theft, acts of wire fraud, and racketeering activity.

155. At all times relevant herein, Cross-Defendants knew, or should have known, that it was likely or certain that the diversion of WaveStrong's profits would result in consequential damage to WaveStrong.

156. As a direct and proximate result of their actions, WaveStrong has been damaged in an amount not less than $3,056,482, plus all consequential damages arising from Cross-Defendants' conduct.

157. In engaging in the wrongful conduct alleged herein, Cross-Defendants, and each of them, are guilty of oppression, fraud, and/or malice, and as a consequence WaveStrong is entitled to and seeks recovery of punitive damages for the sake of example and by way of punishing each of them. Cross-Claimant, as a shareholder of WaveStrong, seek punitive damages on its behalf.

///

///

///

-42-

## SEVENTH CLAIM FOR RELIEF

### Derivative Claim for Fraud Against All Cross-Defendants

158.   Cross-Claimant repeats and realleges paragraphs 1 through 157 hereof, as if fully set forth herein.

159.   On information and belief, based on documents produced in this action prior to removal, Cross-Defendants engaged in an elaborate fraud through which they stole at least $3,056,482 from WaveStrong by causing IT professionals who otherwise would have contracted directly with WaveStrong for lower rates of compensation to sign with SevenSecur, TBB or BASCO. As described in detail above in ¶¶ 59-79, using this scheme, TBB or BASCO would then offer these professionals to WaveStrong for much higher compensation rates, greatly reducing the profit WaveStrong would otherwise make from farming these professionals out to IBM had WaveStrong signed these professionals directly.

160.   In engaging in this fraud, Walia and Sehrai concealed from other WaveStrong personnel and WaveStrong shareholders their role in first identifying these IT professionals using WaveStrong's database and then causing SevenSecur, TBB or BASCO to sign these professionals before offering them back to WaveStrong.

161.   In engaging in this fraud and falsely offering these IT professionals to WaveStrong as their own candidates, Ibrahim, TBB, Bailey and BASCO all concealed from WaveStrong personnel and WaveStrong shareholders the fact that Walia and Sehrai had provided these entities with the names of these professionals and had instructed them to sign these professionals before offering them back to WaveStrong.

162.   At the time these Cross-Defendants concealed the relevant information from WaveStrong personnel and shareholders, Cross-Defendants knew that this information was material and that if WaveStrong were informed that its own CEO (a shareholder) and its own head recruiter were providing SevenSecur, TBB and BASCO with proprietary information so that these other entities could steal WaveStrong's

income from these transactions by providing WaveStrong with falsified referrals drawn from its own database, WaveStrong would have taken immediate action to protect its interests and the interests of its other shareholders.

163. In engaging in this conduct, Cross-Defendants intended to defraud WaveStrong by having WaveStrong use these IT professionals offered by TBB and BASCO in WaveStrong's relationship with IBM. WaveStrong justifiably relied on these referrals by using these IT professionals in its relationship with IBM.

164. As a result of this fraud, WaveStrong suffered damages of at least $3,056,482.

165. In engaging in the conduct complained of herein, Cross-Defendants acted with a willful and conscious disregard of WaveStrong's rights and with an intent to vex, injure and annoy so as to constitute malice, fraud and oppression as set forth in California Civil Code § 3294. Accordingly, WaveStrong is entitled to recover, in addition to actual damages, punitive and exemplary damages in an amount to be appropriate to punish and make an example of Cross-Defendants, as well as to deter Cross-Defendants from engaging in similar conduct in the future. Cross-Claimant, as a shareholder of WaveStrong, seek punitive damages on its behalf.

## PRAYER FOR RELIEF

WHEREFORE, Cross-Claimant, individually and as a shareholder of WaveStrong acting on its behalf in a derivative capacity, prays for judgment against Cross-Defendants, and each of them, as follows:

**On the First Claim For Relief:**

1. Rescission of the September 2021 Stock Purchase Agreement, compensatory damages awarded according to proof, punitive and exemplary damages according to proof, and attorneys' fees pursuant to the terms of the Stock Purchase Agreement.

///

-44-

**On the Second Claim For Relief:**

2.    Judgment in favor of WaveStrong and against Cross-Defendants, and each of them, jointly and severally, in the sum of at least $3,056,482, plus treble and consequential damages arising from Cross-Defendants' misconduct, subject to proof at trial, plus reasonable statutory attorneys' fees.

**On the Third Claim For Relief:**

3.    Judgment in favor of WaveStrong and against the Cross-Defendants, and each of them, jointly and severally, in the sum of at least $3,056,482, plus treble and consequential damages arising from Cross-Defendants' misconduct, subject to proof at trial, plus reasonable statutory attorneys' fees.

**On the Fourth Claim For Relief:**

4.    Judgment in favor of WaveStrong and against the Cross-Defendants, and each of them, jointly and severally, in the sum of at least $3,056,482, plus treble and consequential damages arising from Cross-Defendants' misconduct, subject to proof at trial, plus reasonable statutory attorneys' fees.

**On the Fifth Claim For Relief:**

5.    Judgment in favor of WaveStrong and against Walia in the sum of at least $3,056,482, plus all consequential damages arising from Walia's misconduct, subject to proof at trial.

6.    An award of punitive damages in favor of WaveStrong against Walia.

**On the Sixth Claim For Relief:**

7.    Judgment in favor of WaveStrong and against Cross-Defendants in the sum of at least $3,056,482, plus all consequential damages arising from Cross-Defendants's misconduct, subject to proof at trial.

8.    An award of punitive damages in favor of WaveStrong against Cross-Defendants.

///

**On the Seventh Claim For Relief:**

9.    Judgment in favor of WaveStrong and against the Cross-Defendants, and each of them, jointly and severally, in the sum of at least $3,056,482, plus consequential damages arising from Cross-Defendants' misconduct, subject to proof at trial.

10.    An award of punitive damages in favor of WaveStrong against Cross-Defendants.

**On All Claims For Relief:**

11.    Costs incurred herein;

12.    Prejudgment interest at the maximum legal rate;

13.    That the Court equitably distribute the damages awarded in connection with the derivative claims such that Walia does not share in the recovery as a shareholder of WaveStrong given his wrongful conduct; and

14.    Any other relief that the Court deems just and proper.

Dated:  July 24, 2024.                    Respectfully submitted,


                                          **JGPC LAW**
                                          **TALISMAN LAW, P.C.**


                                          By: _/s/ Lilia Bulgucheva_
                                              James Gulseth, Esq.
                                              Lilia Bulgucheva, Esq.
                                          *Attorneys for Defendants/Cross-Defendants*
                                          *MANDEEP DHOAT and SAFEAEON, INC. and*
                                          *Cross-Complainant MANDEEP DHOAT*

## JURY DEMAND

Cross-Claimant Mandeep Dhoat demands a trial by jury in his individual capacity and in his derivative capacity as a shareholder of WaveStrong, Inc. on its behalf.

Dated:  July 24, 2024.                    Respectfully submitted,


                              **JGPC LAW**
                              **TALISMAN LAW, P.C.**

                            By: */s/ Lilia Bulgucheva*
                                  James Gulseth, Esq.
                                  Lilia Bulgucheva, Esq.
                            *Attorneys for Defendants/Cross-Defendants*
                            *MANDEEP DHOAT and SAFEAEON, INC. and*
                            *Cross-Complainant MANDEEP DHOAT*

## VERIFICATION

STATE OF CALIFORNIA, COUNTY OF ALAMEDA

I have read the foregoing **VERIFIED SECOND AMENDED CROSS-COMPLAINT** and know its contents.

☒ I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief and, as to those matters, I believe them to be true.

☐ I am ☐ an officer ☐ a partner ☐ of XXX a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

☐ I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

☐ The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.
I am one of the attorneys for _____ , a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on July 24, 2024, at Dublin, California.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Mandeep Dhoat _____     _____
Type or Print Name                                        Signature

Verified Second Amended Cross-Complaint;
Case No. 3:24-cv-03716-JSC

# EXHIBIT 1

-49-

**From:** Chris Esemplare
**Sent:** Thursday, August 19, 2021 11:21 AM
**To:** Zafar, S. Shahan
**CC:** Jim Scullion; Gannon, John A.; Gorman, Chris J.
**Subject:** Fwd: My analysis and Redlines for LOI Post call today 08/18
**Attachments:** 210812 WaveStrong LOI vF-HW Redlines.docx

Shahan,
Below is the request for consideration from Harpreet. Read it over / edit before our call if you have time. Below is our perspective. Even if we make no changes - we get him back something asap to close this out one way or another.

Net - one lever is to increase the value of the LOI and eliminate incentives to a lower level. This assumes keeping LOI at $8.5m.

Jim - if I did not capture our conversation accurately, let me know.

- Change the Valuation Offer in LOI to $8.5M – will make it easier for me to sell to MD and RK **(ok - other option is to increase to full value and eliminate much of the below. He loses more to partners but cleaner)**.
- $6M in signing bonus as discussed and offered in Jan 2022. (Should be defined in my employment agreement and rest as in the redlined LOI attached. **(no - legally being advised not to separate out employment agreement - option to add this into the above LOI price)**
- Separate my employment details and only share the components without the actual NUMBERS, from rest of the terms of the LOI that HW/MD/RK sign. **(no - same as above)**
- $3M in performance based bonus broken out by earnout over 2 calendar years (2022 and 2023). Please see attached LOI with redlines for additional details **(TBD)**
- $2M in cash or additional stock for 2 year retention, defined within redlines of attached LOI **(TBD)**
- Need to understanding of my title and role pertaining to WS as wholly owned subsidiary of NewCo and role with NewCo. My assumption is I will continue as President and CEO of WaveStrong (wholly owned subsidiary of NewCo Post Transaction), Board of WaveStrong reporting to Chris E as Chairman of Board, on Board of NewCo. **(no WaveStrong board... naming of roles TBD)**
- Need to have a clear understanding of roll-over equity conversion into NewCo. This is currently un-defined and an important factor for consideration of this offer for me. Please provide details for my review. **(can share information)**
- Need all my agreements (Employment Agreement, MIEP agreement, Stock Agreement for Roll Over, Any other agreements not listed here) which I would need to sign with NewCo post transaction. Need all this agreed upon between me and Nautic in Final Draft form before we proceed with LOI to MD/RK. **(assume can share draft agreements)**
- Restrictive Covenants: 7 years is just unreasonable term of time for restrictive covenants. Also needs to be defined within my employment agreement I am sure in full details in terms of scope of such covenants. Acceptable term to that I am willing to sign is 3 years from date of departure. **(assume this is fine - he is in California so lowering is reasonable)**
- Please share a copy of MIEP agreement and then we can see if I have still further questions on the same. **(fine)**

cesemplare99@gmail.com
914-954-4401

---------- Forwarded message ---------
From: **Harpreet Walia** <Harpreet@wavestrong.com>
Date: Wed, Aug 18, 2021 at 6:22 PM
Subject: My analysis and Redlines for LOI Post call today 08/18
To: Chris Esemplare <cesemplare99@gmail.com>
Cc: jim@secsvcs.group <jim@secsvcs.group>

Hello Chris,

Chris thanks for your time on the call today to further clarify some questions I had and giving me the opportunity to review my thought process and asks detailed below in bullet points and also illustrated in the LOI document with some additional redlines detailing the rationale and thought process.

**Offer of Term sheet in Jan 2021 was follows for reference:**

## Harpreet gets up to $8M in cash; common ownership ~27%

| Total Transaction Value | $20.00 million | |
|---|---|---|
| LOI Purchase Price | $9.00 million | • Structured on a cash-free, debt-free balance sheet, with appropriate working capital to run ordinary course operations at WaveStrong |
| • Harpreet Roll-over | ~$3.47 million | • ~38.5% ownership stake in WaveStrong based on $9.0 million LOI value |
| Transaction Fees/Expenses | $1.00 million | • Customary transaction and closing fees & expenses |
| Total Cash Bonus | $8.00 million | • Additional value above and beyond implied equity value |
| • Employee Signing Bonus | $6.00 million | • Payable in cash at closing |
| • 2022 Performance Bonus | $2.00 million | • Payable based on CY2022 achieving stand-alone revenue target of $27.2M |
| Total Stock Bonus | $2.00 million | |
| • 2-Year Retention Bonus | $2.00 million | • Granted in stock after 2-years from closing date |

| Employment Terms | | • Employment agreement will be executed prior to Transaction closing |
|---|---|---|
| Title | | • CEO & Board Member |
| Reports To | | • Chris Esemplare, Chairman of the Board |
| Base Compensation | $320,000 | • Bi-weekly payroll cycle |
| Target Bonus | TBD | • To be agreed to with Nautic. Payable annually based on a mix of individual booking/sales targets and NewCo company performance |
| Restrictive Covenants | | • 7 year non-solicit and non-hire period, 7 year non-compete<br>• Standard confidentiality provisions |

DISCLAIMER: Unless and until a subsequent definitive written agreement regarding a Transaction between Seller and Nautic has been executed, neither Seller nor Nautic will be under any legal obligation of any kind to negotiate or consummate a Transaction. The terms herein do not bind the Company or Nautic in any way. The timeline presented herein further assumes reasonable access by Nautic and Nautic Representatives to Seller executives and other WaveStrong key personnel.

**For the Deal to work for me, I ask the following to be in consideration:**

- Change the Valuation Offer in LOI to $8.5M – will make it easier for me to sell to MD and RK
- $6M in signing bonus as discussed and offered in Jan 2022. (Should be defined in my employment agreement and rest as in the redlined LOI attached.
- Separate my employment details and only share the components without the actual NUMBERS, from rest of the terms of the LOI that HW/MD/RK sign.
- $3M in performance based bonus broken out by earnout over 2 calendar years (2022 and 2023). Please see attached LOI

with redlines for additional details

- $2M in cash or additional stock for 2 year retention, defined within redlines of attached LOI
- Need to understanding of my title and role pertaining to WS as wholly owned subsidiary of NewCo and role with NewCo. My assumption is I will continue as President and CEO of WaveStrong (wholly owned subsidiary of NewCo Post Transaction), Board of WaveStrong reporting to Chris E as Chairman of Board, on Board of NewCo.
- Need to have a clear understanding of roll-over equity conversion into NewCo. This is currently un-defined and an important factor for consideration of this offer for me. Please provide details for my review.
- Need all my agreements (Employment Agreement, MIEP agreement, Stock Agreement for Roll Over, Any other agreements not listed here) which I would need to sign with NewCo post transaction. Need all this agreed upon between me and Nautic in Final Draft form before we proceed with LOI to MD/RK.
- Restrictive Covenants: 7 years is just unreasonable term of time for restrictive covenants. Also needs to be defined within my employment agreement I am sure in full details in terms of scope of such covenants. Acceptable term to that I am willing to sign is 3 years from date of departure.
- Please share a copy of MIEP agreement and then we can see if I have still further questions on the same.

I think captured all the high level points as we discussed on our call today and hope you can discuss with Jim and Nautic team to obtain feedback. Feel free to reach out if you have any further questions on the above and attached.

Best Regards,

**Harpreet S. Walia**

President and CEO

WaveStrong Inc.

(925)549-2882 (cell)

(866)388-2002 (fax)

email: harpreet@wavestrong.com

url: www.wavestrong.com

This email and any files transmitted with it are confidential and may contain Wavestrong proprietary information intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify postmaster@wavestrong.com or the sender. If you are not the named addressee, you should not disseminate, distribute or copy this email, please delete this email immediately from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

**CONFIDENTIAL**                                                                                      **NAU001921**

# EXHIBIT 2

-50-

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT ("Agreement") is entered into as of the date last signed below ("Effective Date"), by and among Mandeep Dhoat ("Seller") and Harpreet Walia ("Buyer") and WaveStrong, Inc. ("Corporation").

### RECITALS

A. Corporation is a California corporation engaged in information security and data privacy consulting together with related business. Corporation is currently headquartered at 5674 Stoneridge Drive #225, Pleasanton, California - 94588.

B. Buyer and Seller are shareholders in Corporation's stock with Buyer currently holding 38.5% (38.5 Shares) and Seller holding 36.5% (36.5 Shares) of the total outstanding shares (100 Shares).

C. Corporation has been marketed for sale including current negotiations with a third-party private equity firm (Nautic Partners) being the most recent potential purchaser.

D. Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, a portion of the Shares currently held by Seller, to Buyer, together with all the rights and privileges attached thereto.

E. It is the intent of the parties that the sale of shares hereunder will be final and complete under the terms of this Agreement, notwithstanding any later offers and/or sales of shares of Corporation to third parties.

### AGREEMENT

NOW THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, do hereby agree as follows:

1.1 Shares to be Sold. Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, a 12.5% interest (12.5 Shares, the "Shares") in Corporation under this Agreement, together with all the rights and privileges attached thereto. Upon the terms and subject to all of the conditions contained herein, on the Effective Date, Seller hereby agrees to sell, assign, transfer and deliver to Buyer, and Buyer agrees to purchase and acquire from Seller, the Shares.

1.2 Purchase Price. Buyer shall pay One Million Dollars ($1,000,000) ("Purchase Price") to Seller as and for the Shares under the terms contained herein. All amounts stated herein to be paid shall be paid in lawful currency of the United States.

1.3 Due Diligence. Buyer has been a shareholder, officer, director and employee of the Corporation and is familiar with the Corporation's business. Buyer has conducted due diligence is satisfied as to the value of the Shares he is purchasing. Buyer has relied on his own judgment and advice of his accountants, attorney's and other advisors (if any) in making his decision to purchase the Shares from Seller.

1.4  Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the office of Corporation's legal counsel, Cirrus Law PC, 6600 Koll Center Parkway, Suite 250, Pleasanton California, no later than 5:00 pm on September 24, 2021 or as otherwise mutually agreed upon by the parties (sooner or later).  At the Closing, Seller shall deliver to Buyer certificates representing the Shares, duly endorsed by Seller or accompanied by executed stock transfer powers.  Unless expressly stated otherwise herein, said transfer of shares shall constitute transfer of all ownership rights and privileges attached.  Within seven days of receipt of said certificates and/or stock transfer powers, Buyer shall pay the Purchase Price via wire transfer to Seller's account(s) as designated by Seller in writing.

1.5  Share Ownership and Effective Date.  The parties acknowledge and agree that any benefits or burdens of share ownership will apply according to the incidents of ownership of the Shares before and after the Effective Date and said owner will be responsible for and benefitting under ordinary corporate and accounting principles. Seller hereby waives any known or unknown claims of any kind to the Shares or any benefits therein including (but not limited to) benefits arising from the sale of the Shares to Nautic or any other party in the future.

1.6  Termination of Agreement.  This Agreement and the transactions contemplated hereby may be terminated at any time prior to the Closing (a) by mutual written agreement of Buyer and Seller, (b) by either party if the Closing shall not have occurred by September 24, 2021 or (c) by either party if the other party (i) is not able to perform the obligations under this Agreement required to be performed at or prior to the Closing or (ii) materially breaches its obligations under this Agreement and such breach has not been cured within five (5) days after such party has provided to the breaching party written notice of such breach. If this Agreement is terminated as set forth in this Paragraph, Buyer shall be refunded any payments made.

1.7 Seller's Resignation.   Upon executing this agreement, Seller agrees to tender his resignation from his employment with the Corporation including resignation as an Officer of Corporation with an effective date of September 30, 2021. Seller hereby waives any rights to compensation or other benefits arising from employment including (but not limited to) any rights arising from any letters of employment including (but not limited to) one dated on or about October 3, 2019 and any Separation Pay stated therein.  However, Seller does not forfeit or waive his rights in any remaining shares he retains, nor his position on the Board of Directors of Corporation and will be paid any compensation including base salary and bonus earned up to the Effective Date.  Seller must return, forfeit and surrender all Corporation property (physical, intangible and intellectual) prior to receiving any remaining compensation due.

### GENERAL PROVISIONS.

1.8  Counterparts. This Agreement may be executed in counterparts and signatures by email or facsimile, each of which shall be deemed an original and together shall constitute one and the same agreement.

1.9  Successors and Assigns; Parties in Interest.  This Agreement shall be binding upon and inure solely to the benefit of each party hereto and their respective successors and permitted assigns and nothing in herein, express or implied, is intended to or shall confer upon any other person any rights, interests, benefits or remedies of any nature whatsoever under or by reason of this Agreement.  Either party may assign its rights and/or delegate its obligations under this

Agreement; provided, however, that no such assignment or delegation shall relieve the assigning or delegating party of its obligations under this Agreement.

1.10 Severability.  If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the rest of the Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

1.11 Entire Agreement; Amendments. This Agreement and the Exhibits attached hereto constitute the entire agreement between the parties hereto, and supersede all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereto. This Agreement may be amended at any time and from time to time, but any amendment must be in writing and signed by each person who is then a party.

1.12 Construction.  The singular shall include the plural and the plural shall include the singular, as the context may require.  Each gender shall include the other gender and neutral gender.  Section and paragraph captions are for convenience of reference only and shall not be considered in construction of the terms of this Agreement.  The parties have reviewed this Agreement and had the opportunity to make any and all revisions required.  Consequently, this Agreement shall be considered to have been drafted jointly and the rule of construction and law that any ambiguity should be construed against the party drafting the Agreement shall not apply to this document or any document in connection with this sale.

1.13 Notices.  All notices, demands and requests required or permitted to be given hereunder shall be deemed duly given if e-mailed as follows:

SELLER:   Mandeep Dhoat Mandeep@wavestrong.com
BUYER:    Harpreet Walia Harpreet@wavestrong.com

1.14 Fees and Expenses.  Each party shall bear its own fees and expenses incurred in connection with the negotiation, execution and performance of this Agreement except that Buyer agrees to reimburse Seller for one-half of the cost for preparation of this Agreement.

1.15 Governing Law; Jurisdiction. This Agreement shall be governed by the laws of the state of California (regardless of the laws that might otherwise govern under applicable principles of conflict of law) as to all matters, including matters of validity, construction, effect, performance and remedies. The parties hereto agree to submit to the personal and exclusive jurisdiction of the state and federal courts of Alameda County, California with respect to the enforcement or interpretation of this Agreement or the Parties' obligations hereunder.

1.16 Further Assurances.  The parties shall use their commercially reasonable efforts to do and perform or cause to be done and performed all such further acts and things necessary, proper or advisable and shall execute and deliver all such other agreements, certificates, instruments or documents as any other party may reasonably request in order to satisfy the conditions of this Agreement and otherwise carry out the intent and purposes of this Agreement and consummate the transactions contemplated hereby.

1.17 Good Will and Non-disparagement.  The parties agree to act at all times with fidelity and good will and not to denigrate or disparage one another.  It is understood that the future reputations and success of the parties and the Corporation are dependent on mutual respect and support in all endeavors.

1.18 Dispute Resolution and Attorneys' Fees.  Should any dispute arise concerning this Agreement, the parties will submit the matter to Cirrus Law PC for mediation, before resorting to arbitration or legal action.  If either party engages legal counsel to enforce its obligations under this Agreement, the prevailing party shall be entitled to recover, from the other party, its costs and expenses in connection therewith, including, without limitation, reasonable attorneys' fees.

IN WITNESS WHEREOF, the parties have entered into and signed this Agreement as of the last date noted below.

**Seller:**

Mandeep Dhoat

Date:_____**09/24/2021**_____

**Buyer:**

Digitally signed by Harpreet Walia
Date: 2021.09.27 08:58:41 -07'00'

Harpreet Walia

Date:_____

**WaveStrong, Inc.**

Digitally signed by Harpreet Walia
Date: 2021.09.27 08:58:57 -07'00'

By: Harpreet Walia, President and CEO

Date:_____

**PROOF OF SERVICE**

I, the undersigned, declare:

I am employed in the Town of Danville, County of Contra Costa, California.  I am over the age of 18 years and am not a party to this action.  My business address is 5890 Stoneridge Drive, Suite 102, Pleasanton, CA 94588.

I am readily familiar with the business practices of JGPC Law for the collection and processing of correspondence for mailing with the United States Postal Service and that correspondence is deposited with the United States Postal Service that same day in the ordinary course of business.  On July 24, 2024, I served the following document(s):

**VERIFIED SECOND AMENDED CROSS-COMPLAINT**

and served in the manner(s) described below address as follows:

| | |
|---|---|
| Donald E. Chomiak, Esq.<br>Talisman Law, P.C.<br>100 Wilshire Blvd., Suite 700<br>Santa Monica, CA 90401<br>*don@talismanlaw.com*<br><br>*Attorneys for Defendants/Cross-Defendants Mandeep Dhoat and SafeAeon, Inc. and Cross-Claimant Mandeep Dhoat* | Justin Scott Draa, Esq.<br>Edward Colbert, Esq.<br>Linda Todd<br>Sam Stockwell<br>Draa & Lapcevic, LLP<br>1101 Pacific Avenue, Suite 320<br>Santa Cruz, CA 95060<br>*jdraa@dld-law.com*<br>*wal@dld-law.com*<br>*ecolbert@dld-law.com*<br>*sstockwell@dld-law.com*<br>*mbounds@dld-law.com*<br>*ltodd@dld-law.com*<br><br>*Attorneys for Defendant/Cross-Complainant Harpreet Walia, Defendant Walia Estates, LLC and Defendant SevenSecur, Inc.* |
| Kenneth B. Julian, Esq.<br>David Boyadzhyan, Esq.<br>MANATT, PHELPS & PHILLIPS, LLP<br>695 Town Center Drive, 14th Floor<br>Costa Mesa, CA 92626<br>*kjulian@manatt.com*<br>*dboyadzyan@manatt.com*<br><br>*Attorneys for Harpreet Walia and SevenSecur Inc.* | Paul B. Derby, Esq.<br>Johnny O'Kane IV, Esq.<br>Mane Sardaryan, Esq.<br>Adriana Erquiaga, Esq.<br>Z'Aujanae Thomas<br>Skiermont Derby, LLP<br>633 West Fifth Street, Suite 5800<br>Los Angeles, CA 90071<br>*pderby@skiermontderby.com*<br>*jokane@skiermontderby.com*<br>*msardaryan@skiermontderby.com*<br>*aerquiaga@skiermontderby.com*<br>*zthomas@skiermontderby.com*<br><br>*Attorneys for Defendant WaveStrong, Inc.* |

[X] (BY EMAIL/ECF) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent to the person(s) at the email address(es) listed above.  I did not receive, within a reasonable time after the transmission, any

electronic message or other indication that the transmission was unsuccessful.

[  ] (BY MAIL) I am readily familiar with my firm's practice for collection and processing of correspondence for mailing with the United States Postal Service, to-wit, that correspondence will be deposited with the United States Postal Service this same day in the ordinary course of business.  I sealed said envelope(s) and placed it for collection and mailing on the date indicated below, following ordinary business practices.

[  ] (BY EXPRESS MAIL) I am readily familiar with the practice of the firm for the collection and processing of correspondence for overnight delivery and know that the document(s) described herein will be deposited in a box or other facility regularly maintained by USPS Priority Express for overnight delivery.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on July 24, 2024, at Danville, California.

_____
Lilia Bulgucheva

_2_

PROOF OF SERVICE